IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TINA M. RILEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05-1069-CV-W-NKL |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Pending before the Court is Tina Riley's ("Riley") Motion for Summary Judgment [Doc. # 7]. Riley seeks judicial review of the Commissioner's denial of her request for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* The Court finds that the Administrative Law Judge's decision is supported by substantial evidence in the record as a whole.

**I.     Background**

Riley filed her application for disability benefits on May 28, 2003. She alleged a disability onset date of May 31, 2002, and she alleged disabling impairments of neck pain and headaches. (Tr. 130, 145, 162.) Riley was approximately 33 years old when she filed her application. Riley's past work experience included work as a nurse's assistant in a nursing home facility.

1

### A. Medical Overview

On August 14, 2001, Riley presented to the emergency room at Excelsior Springs Medical center for hip pain. (Tr. 206.) An x-ray from that day revealed that there was no evidence of fracture, dislocation, bony destruction. (Tr. 208.) It did note that there was some early mild degenerative arthritis. Riley returned to the emergency room a few days later on August 17. Her diagnosis was lumbar and sacral strain. (Tr. 209.)

On September 21, 2001, Riley injured her left foot and she sought emergency medical treatment. (Tr. 212-15.) She was assessed with a contusion sprain, but an x-ray revealed "no evidence of acute fracture or dislocation." (Tr. 215.)

On April 3, 2002, Dr. Manoch Kuangparichat treated Riley and he diagnosed her with low back pain-strain. (Tr. 219.) A few days later, on April 8, Dr. Aram Lila diagnosed Riley with recurrent lumbar strain. (Tr. 221.)

Dr. Sidney Cantrell treated Riley on May 31, 2002. (Tr. 284.) Dr. Riley assessed positive trigger points for pain and he observed that Riley's range of motion in her right arm was painful for her. On June 7, 2002, Dr. Cantrell assessed Riley with rotator cuff pain with flexion. (Tr. 283.)

Dr. Cantrell referred Riley to Dr. David Paul at the Excelsior Springs Medical Center so he could evaluate her. (Tr. 351.) On June 21, 2002, Dr. Paul limited Riley to "sit down work only." He did not think she should be doing any lifting, pulling, or pushing. Dr. Paul recommended an MRI of Riley's back.

Afer the MRI, Dr. Paul stated that it was negative for radiculopathy, but he

2

believed the test was a false negative. (Tr. 346.) He diagnosed cervical disc herniation of C5-6 and C6-7. He maintained the same work restrictions.

On June 25, 2002, Riley underwent an electrodiagnostic evaluation performed by Dr. Robert Trout. (Tr. 349.) Dr. Trout concluded that the evaluation revealed no evidence of radiculopathy, plexopathy, carpal tunnel syndrome, or peripheral neuropathy.

On July 1, 2002, Riley was seen at the North Kansas City Hospital by Dr. James Scowcroft for pain management. (Tr. 255-56.) Riley was referred to Dr. Scowcroft by Dr. Paul. Regarding Riley's musculoskeletal impairments, Dr. Scowcroft noted from his physical examination:

> She has normal flexion of her neck. She has decreased extension to approximately 35 degrees. She can laterally rotate 90 degrees in each direction. On examination of her upper extremities she has full range of motion of shoulders, wrists, and elbows. Strength in her upper extremities is preserved. Examination of her back - there are two large trigger points noted in the right paraspinal muscles at the level of T3 and T4. This reproduces her pain.

(Tr. 255-56.) Regarding her neurological complaints, Dr. Scowcroft noted:

> MRI of cervical spine shows hypertrophic changes at the margin of C4-5, C5-6. There may be associated disc herniation at these two interspaces. No evidence of thoracic herniation.

(Tr. 256.) Dr. Scowcroft gave Riley trigger point injections to help ease her pain. He gave her additional trigger point injections on July 18, 2002. (Tr. 251.)

On July 22, 2002, Dr. Paul stated that Riley's pain had "failed conservative measures. I am going to have her see a neurosurgeon for surgical evaluation. I have performed everything that I can at this point." (Tr. 345.)

3

Dr. Paul referred Riley to Dr. Phillip Hylton at The Kansas City Neurology Group. (Tr. 335-37.) When observing Riley, Dr. Hylton did not detect that she was in any pain, even though she rated her pain as an 8 out of a possible 10. Dr. Hylton's radiographic results demonstrate "degenerative changes at C4-5 and C5-6." (Tr. 336.) He also noted degenerative changes "of a minor degree" in the thoracic region. Riley's EMG and nerve conduction studies were found to be within normal limits. Regarding his impression and recommendation for Riley, Dr. Hylton stated:

> Cervical strain with traction type mechanism superimposed upon preexisting spondylitic changes in the cervical spine. I am unable to correlate a true radicular pattern to her pain and predominantly her symptoms are that of a soft tissue or structural nature. From a surgical standpoint, I find that the predictability of a surgical procedure for the spondylitic changes is poor with regard to resolution of her specific symptom complex. As such on a risk/benefit ratio, I would advise against surgical treatment. Recommendations are to proceed with rehabilitative efforts and maximize soft tissue treatments. The patient would be eligible for work in a capacity that does not require reproduction of the mechanism of the injury and as such should avoid activities that pull down on th arms, shoulders, and pull forward with the head and neck. Clerical level activities or other activities in that activity level should be tolerated by the patient. I do not feel that I have much else to offer the patient at this time.

(Tr. 337.)

In August 2002, Dr. Steven Hendler, with Disability Management Associates, treated Riley. (Tr. 304-06.) According to Riley's report to Dr. Hendler, she climbed stairs and drove without difficulty. She reported that she cooked and that her children helped with chores in the home. Riley reported being taken off work completely because her employer was not complying with the restrictions imposed. Dr. Hendler concluded:

4

> The MRI of the cervical spine showed posterior central herniation of the
> C5-6 and C6-7 disks with slight cord compression and probable
> hypertrophic bony spurring associated with the noted changes.

(Tr. 306.) There was no tenderness in Riley's back and her flexion was 90 degrees and her extension was 30 degrees. Dr. Hendler prescribed a home traction unit and additional physical therapy. He stated that she could work "with limitations of lifting and with at will position changes." (Tr. 307.)

On September 3, 2002, Dr. Hendler stated that Riley could return to work on sedentary duty. (Tr. 302-03.) He stated that she could occasionally lift ten pounds and occasionally work overhead with her arms.

Dr. Hendler treated Riley again on September 13, 2002. (Tr. 298-99.) An x-ray revealed the same objective findings as those listed above. Dr. Hendler encouraged Riley to seek out work conditioning and he stated:

> Patient does appear to be very resistant to returning to work and this seems
> to color much of the discussion. There are no objective findings which
> would preclude her from the original restrictions I've set for her but I'm
> going to go with the current parameters for now while we get her set into
> the work conditioning programming and into the workplace on a full time
> basis.

(Tr. 299.) On October 4, 2002, Dr. Hendler continued Riley's sedentary work restriction. (Tr. 297.)

On September 14, 2002, Riley was discharged from the care of Rehabilitation Services in Excelsior Springs. (Tr. 222.) According to the discharge summary, cervical traction was the only treatment that provided relief for Riley's pain. Even then, the relief

last for only a few hours and her pain returned by the next day. The summary states that Riley had returned to work with fully duty.

On September 16, 2002, Dr. Scowcroft gave Riley an epidural injection at C6-7. (Tr. 243.) On September 20, 2002, Dr. Scowcroft stated that he had not made much progress in controlling Riley's pain because she was still rating it as a 7 to 8 out of a possible 10. Dr. Scowcroft decided to hold off on providing Riley with additional epidural or trigger point injections so she could continue treatment with Drs. Paul and Hylton.

On October 4, 2002, Dr. Paul released Riley back to work with the same restrictions that had previously been imposed. (Tr. 272.) The signature on the release is illegible, but it is written on a notepad from Dr. Paul's office. Riley does not contest that the release is from Dr. Paul.

On October 7, 2002, Dr. Hylton released Riley back to work with the following limitations: lifting 25-30 pounds occasionally, occasionally climbing, frequent standing, and walking and sitting at will. (Tr. 294.) Dr. Hylton stated that Riley could occasionally perform overhead work with her arms and she could occasionally kneel, crouch, and crawl.

On October 8, 2002, Dr. Robert Trout conducted an EMG, which came back normal with "no findings of radiculopathy, plexopathy, carpal tunnel syndrome, or ulner neuropathy." (Tr. 340.)

On January 22, 2003, Riley went to the emergency room for severe pain in her

back and numbness in her right arm. (Tr. 273.) The attendant stated that Riley did not appear to be in acute distress.

On April 8, 2003, Riley reported to the emergency room again with complaints of back pain and pain show up through her neck with both arms tingling. (Tr. 329.)

Riley again saw Dr. Hylton in May 2003. (Tr. 333-34.) Dr. Hylton noted that Riley had previously been found capable of light physical work. Riley's condition was unchanged since her last appointment with Dr. Hylton. Dr. Hylton concluded:

> She has had extensive therapy including physical therapy, epidurals, trigger point therapy, and has not been able to improve with the work hardening program and claims that it has made her worse . . . . I do believe that the patient has reached maximal medical improvement. I have reviewed her prior work restrictions and am in agreement with those measurements. I do feel that from the examination and structural findings that she should be capable of performing light physical activity. Unfortunately, I do not feel that there is anything else we have to offer from a surgical standpoint in the treatment of this patient.

(Tr. 334.)

On July 10, 2003, Riley filled out a questionnaire created by the Commissioner. (Tr. 187-92.) In the questionnaire, she stated that she grocery shopped about once a week and that she cooked meals, although the meals she cooked were "low maintenance" because of her inability to stand for a long time. (Tr. 190.) Her hobbies included gardening a small patch, sewing for short periods of time, and watching television. Regarding her daily activities, Riley listed making the bed, picking up things around the house, showering, watching television, fixing dinner, washing dishes, and doing laundry about twice a week. Riley stated that she cannot sit long enough to watch a thirty-minute

television show or work on the computer. Riley stated that she drove about twice a week, but she did not take trips over one hour because of her pain.

Riley treated with Dr. Cantrell a few times during 2004 for her back pain. During those treatments, Dr. Cantrell merely assessed trigger points for Riley's pain. Those appointments occurred in February, April, and June. (Tr. 376, 368, 367, respectively.)

On January 27, 2005, Riley reported to Dr. Cantrell that she was unable to do any house or yard work. He assessed positive trigger points. (Tr. 364.)

Riley underwent another MRI the next day that was administered by Dr. Robert Lackamp. (Tr. 363.) The summary of the MRI stated:

1. There is transverse spondylitic changes at C5-6 with moderate central canal narrowing and bilateral neural foraminal narrowing, but without focal herniation of nerve root entrapment.

2. At C6-7 there is somewhat less impressive spondylitic changes and an overall moderate central canal narrowing. There is a small right paracentral disc protrusion but no nerve root entrapment is identified.

3. Some less spondylitic changes are seen at other levels but these are not significant.

(Tr. 363.)

In March 2005, Riley again reported to Dr. Cantrell that she was unable to do house work or yard work. (Tr. 362.) He again assessed positive trigger points.

### B. Evaluations

At the request of Dr. Hendler, Kathy Diemer, an employee at HealthSouth, filled out a functional capacity evaluation for Riley in October 2002. (Tr. 269-71.) Dr. Hendler

8

referred Riley to Diemer so he could impose work restrictions on her. Diemer stated that Riley could perform light work, which was defined as "Exerting up to 20 lbs. force occasionally and/or up to 10 lbs. force frequently and/or a negligible amount of force constantly to move objects." (Tr. 269.) Diemer stated that Riley could perform a job that required constant sitting or constant walking as well as a job that required frequent standing or stooping. Diemer stated that Riley could perform these duties consistently.

In February 2003, an employee physician with the Commissioner completed a Residual Functional Capacity ("RFC") Assessment based on Riley's medical records. (Tr. 285-91.) The Assessment stated that Riley could frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. (Tr. 286.) She could push or pull for unlimited amounts of time and she could occasionally lift and carry 20 pounds. Regarding postural limitations, the Assessment stated that Riley could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but she could never climb a ladder or scaffold nor could she crawl. She had a limited ability to reach overhead and an unlimited capacity to handle, finger, and feel objects. No other restrictions were imposed by the Assessment.

In March 2003, Dr. Brent Koprivica submitted a medical assessment for Riley's underlying workers' compensation claim against her previous employer. (Tr. 314-24.) Dr. Koprivica considered Riley to be "temporarily and totally disabled . . . with the level of debilitating pain with which she presents" for purposes of her workers' compensation claim. Dr. Koprivica examined Riley, but only once as part of his workers' compensation

9

evaluation.

A Physical RFC Assessment was filled out in July 2003. (Tr. 353-60.) The only significant difference between the February 2003 Assessment and the Physical Assessment is that the latter stated Riley could stand and/or walk for at least 2 hours in an 8-hour workday. (Tr. 354.)

**C.    The Hearing**

*1.    Riley's Testimony*

Riley testified that she needed help with household chores from her husband and children. Other than picking up things around the house, she stated that she is unable to do more demanding chores. (Tr. 34-35.) She also testified that she no longer gardens or mows the lawn.

Riley testified that she is unable to go to the movies or to church because sitting causes her too much pain. She did state that she watches her daughter's sporting events at school. She testified that she cannot sit at a computer for more than thirty minutes before she needs to get up and move around.

Regarding her pain, Riley testified that she suffers from constant burning in her back that is exacerbated by activity. She also stated that she experiences tingling and numbness in her arm from her neck to her elbow about two to three times per week. (Tr. 38.)

Riley testified that she was fired from her previous job as a nurse's assistant in a nursing home because she was unable to perform the work duties. She also stated that her

10

employer had refused to accommodate her work restrictions imposed by her physicians.

Riley stated that she could drive, but only for about an hour and then she needed to move. She also testified that a gallon of milk was the most she could lift. (Tr. 44.)

### 2. *Medical Expert*

Dr. Malcolm Brahms was called as a medical expert to testify at the hearing. Dr. Brahms was a specialist in orthopedic surgery. Dr. Brahms affirmed that Riley may have some discomfort in her shoulder area, but he testified that she could perform at least light duty work and she was not disabled under the Commissioner's guidelines. (Tr. 50-51.)

### 3. *Vocational Expert*

The ALJ called Lesa Keen to testify as the vocational expert. Keen was asked to consider an individual with a background similar to Riley, including that she had a tenth grade education and had obtained a nurse's assistant certification. Keen was also asked to keep in mind Riley's past work experience in a nursing home and her earlier work experience as a daycare worker, an office worker, a housekeeper, and a telemarketer. (Tr. 52.)

Keeping these facts in mind, the ALJ submitted a hypothetical to Keen that asked her to assume the individual in question had complaints of pain in the right scapular area, with herniated discs, headaches, an ability to lift and carry objects on an occasional basis up to twenty pounds and on a frequent basis up to five to ten pounds, and with a need to work in a seated position that would preclude the entire range of light work. (Tr. 52-53.) Keen responded that this individual would be able to perform the past work as a

11

telemarketer because it was sedentary, but not the other jobs listed above. Keen also stated that an individual with Riley's background and these impairments could perform other light work, such as a bench assembler, cashier, and photocopy operator. (Tr. 53.)

The ALJ posed a second hypothetical and changed the foregoing restrictions so the individual was restricted to not lift over ten pounds at a maximum and no more than two to three pounds on a frequent basis. The job would also include a sit/stand option. Keen responded that there were sedentary cashiers, surveillance system monitors, and information clerk positions available with these restrictions. (Tr. 54.)

The ALJ further refined the hypothetical and asked Keen to consider whether the individual could work if the individual experienced pain and discomfort such that the individual would have trouble maintaining an adequate concentration and persistence and pace to a moderate or even a marked degree. Keen responded that this individual would be unable to work. (Tr. 55.)

In response to a query by Riley's counsel, Keen responded that the hypothetical individual would be precluded from all work if the individual had to miss three days of work a month due to migraine headaches. (Tr. 58.)

### D. The ALJ's Decision

The ALJ found that Riley's impairments of degenerative disc disease and headache pain were both severe. (Tr. 23.) He determined that her RFC was "consistent with performing work at the light exertional level. The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant, however, requires a

12

sit/stand option." (Tr. 24.) Based on Keen's testimony, the ALJ found that Riley could perform light work such as bench assembler, cashier, and photocopy machine operator.

## II. Discussion[1]

Riley argues the ALJ erred in formulating her RFC and assessing her credibility.

### A. Riley's RFC

Riley submits two argument sections regarding her RFC. In both sections, she asserts that the ALJ failed to give proper weight to the opinion of her treating physician, Dr. Paul, and to the opinion of Dr. Koprivica.

The Eighth Circuit has noted that the relevant evidence to an RFC determination includes the medical records, observations of treating physicians and others, and an individual's own description of the individual's limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted); *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (citation omitted).

The ALJ stated that he gave more weight to the opinions of Drs. Hylton, Hendler, and Brahms. (Tr. 20.) The opinions of all three doctors are consistent with the ALJ's RFC finding.

In August 2002, Dr. Hylton stated that Riley should be able to perform clerical level activities or other activities in that activity level. (Tr. 337.) He stated that Riley should avoid tasks that pull down on the arms and shoulders and pull forward with the

---

[1] Upon review of the record and the law, the Commissioner's position is found to be persuasive. Much of the Commissioner's brief is adopted without quotation designated.

13

head and neck. (Tr. 337.) In May 2003, Dr. Hylton stated that Riley could return to light physical activity. (Tr. 334.) At the administrative hearing held on May 25, 2005, Dr. Brahms testified that he agreed with the opinion of Dr. Hylton stating Riley could perform light work. (Tr. 49.)

Dr. Hendler treated Riley on three occasions from August 26, 2002 through October 7, 2002. (Tr. 293-313.) Riley was released to work following each examination. (Tr. 294, 302-03.) The doctors' conclusions were consistent with the RFC Assessment that was performed in October 2002. (Tr. 267-71.) The Assessment found that Riley could return to light work exerting 20 pounds occasionally and 10 pounds frequently. Dr. Hendler stated in October 2002 that Riley could return to work with a lifting limitation of 25-30 pounds occasionally with walking and standing as desired. (Tr. 294.)

Although the ALJ failed to give controlling weight to the opinion of Dr. Paul, Riley fails to demonstrate how Dr. Paul's conclusions would have supported her claim. On October 4, 2002, Dr. Paul released Riley to return to work, which is consistent with the findings of the doctors outlined above. (Tr. 272.) This is consistent with Dr. Paul's release of Riley back to work in June 2002. (Tr. 351, 346.) The portions of Dr. Paul's notes that Riley cites in her brief do not state that Riley is disabled nor do they state that her pain precludes her from performing light work. In addition, there is no evidence that Dr. Paul's treatment notes support Riley's claim for disability.

Riley also argues the ALJ erred when he ignored the opinion of Dr. Koprivica. The ALJ, however, discussed Dr. Koprivica's opinion and found that he was not a

14

treating physician and his opinion was not supported by the record.  The opinion of a consulting physician who examined a claimant once does not constitute "substantial evidence" upon the record as a whole.  *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).  This is particularly true here where Dr. Koprivica's assessment was for the purposes of evaluating Riley's claim for workers' compensation benefits rather than Social Security disability.

The Court finds that the ALJ's RFC formulation is supported by substantial evidence in the record.

### B. Riley's Credibility

Where an ALJ specifically discredits a claimant's testimony for stated reasons, the court normally defers to the ALJ's determination of credibility.  *Russell v. Sullivan*, 950 F.2d 542, 545 (8th Cir. 1991).  The primary question is not whether a claimant experiences the symptoms alleged, but whether it is credible that they are of the severity to prevent her from performing any type of work.  *McGinnis v. Chater*, 74 F.3d 873, 874 (8th Cir. 1996).

Although the Commissioner may not reject a claimant's subjective complaints solely because of a lack of objective evidence, the absence of such evidence to support the degree of severity alleged is an important factor to be considered.  *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997).  As the ALJ discussed in his decision, the medical evidence as a whole does not support symptoms of the severity that Riley alleges.

On August 20, 2002, although she rated her pain as 8 out of 10, Riley did not

appear to be in acute distress and Dr. Hylton did not detect the appearance of her being in significant pain. (Tr. 336.) Riley had no sensory loss, symmetrical reflexes and no atrophy. (Tr. 336.) An MRI did not detect any distinct foraminal compression and there was no signal change within the spinal cord. (Tr. 336.) An EMG and nerve conduction studies were within normal limits. (Tr. 337, 340.) Additionally, on May 8, 2003, Dr. Hylton stated that some of Riley's symptoms did not correlate to any objective or clinical findings. (Tr. 22, 334.) In January 2003, when Riley presented to the emergency room for back pain, the attendant also noted that she did not appear to be in any acute distress. (Tr. 273.)

In addition to objective medical evidence, the ALJ also considered the subjective evidence of record and articulated inconsistencies which led him to find that Riley was less than fully credible. The ALJ found that Riley's contention of disabling pain was undermined by the questionnaire she completed. (Tr. 22, 187-92.) Riley stated that she was capable of household chores including grocery shopping, making simple meals, making beds, washing dishes, folding laundry, working in the garden, and sewing for short periods of time. She also stated that she could drive. During her testimony at the hearing, she stated she could not do some of these activities, but there is no worsening of her condition that would explain a change in her abilities between the time of the questionnaire (July 2003) and the hearing (May 2005). Although her activities were not extensive, the ALJ found that they were consistent with light work. *Walker v. Shalala*, 993 F.2d 630, 631-32 (8th Cir. 1993) (driving, cooking and washing dishes inconsistent

with claims of disabling pain).

The ALJ also considered Riley's sporadic work history and low earnings in evaluating her credibility. From 1989 to 2000, Riley earned in excess of $10,000 in only three years (2000-2002). (Tr. 127.) In four of those years, Riley earned less than $1,000 annually, with two of those four years reflecting no earnings. (Tr. 127.) An ALJ may discount a claimant's credibility based upon the claimant's poor work record. *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (plaintiff's prior work history characterized by fairly low earnings and significant breaks in employment casts doubt on his credibility).

The ALJ articulated the inconsistencies upon which he relied in discrediting Riley's testimony. There is substantial evidence in the record to support that determination and the ALJ's decision will be affirmed.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Riley's Motion for Summary Judgment [Doc. # 7] is DENIED. The decision of the Commissioner is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATE: June 20, 2006
Jefferson City, Missouri